**WO**  KM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Angela Ashworth,            | No.  CV 19-02761-PHX-SPL (JZB) |
|---|---|
| Plaintiff,                  |                                |
| v.                          | **ORDER**                      |
| State of Arizona, et al.,   |                                |
| Defendants.                 |                                |

Plaintiff Angela Ashworth, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants move for summary judgment. (Doc. 131.) The Motion is fully briefed. (Docs. 139, 143.) The Court will deny the Motion with respect to Defendants Western and Coleman.

**I.      Background**

In her First Amended Complaint (Doc. 24), Plaintiff raised three grounds for relief and sought money damages. In Count One, Plaintiff, who then was confined in the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR),[1] claimed Defendants violated her Eighth Amendment rights when she was denied prompt medical treatment on June 5, 2017, and when they retaliated against her for offering testimony in the class action *Parsons v. Ryan*, CV 12-00601-PHX-ROS. In Count Two, Plaintiff alleged Defendants conspired to retaliate against her, in violation of the First Amendment, for offering

---

[1] Plaintiff was released from the ADCRR on May 19, 2018. *See* https://corrections.az.gov/public-resources/inmate-datasearch, (search "Number Search" for "315041" and click on hyperlink for "Inmate Full Information") (last visited Mar. 1, 2022).

testimony in the *Parsons* case. In Count Three, Plaintiff alleged Defendants Abbott and Hale violated her First Amendment rights when they interfered with her right to send and receive mail, her right to seek an attorney, and her right to "redress in civil court for a violation of her Civil Rights."

On January 11, 2021, Plaintiff and Defendants Corizon Health, Inc. (Corizon), Ryan, Pratt, and Miller notified the Court that they had settled certain claims in this case. (Doc. 105.) On March 12, 2021, the parties filed a Stipulation of Dismissal. (Doc. 110.) In a March 19, 2021 Order, the Court dismissed with prejudice Defendants Corizon and Miller. (Doc. 112.)

Although the parties also stipulated to the dismissal of some medical claims against Defendants Ryan and Pratt, the Court denied that stipulation in the March 19, 2021 Order unless "the parties indicate, with precision, what claims remain against Mr. Ryan and Mr. Pratt and who represents the defendants in relation to any remaining claims." (Doc. 112 at 2.) The parties filed no further clarification regarding the medical claims against Defendants Ryan and Pratt.

On July 28, 2021, the Court granted the parties' Joint Stipulation to Dismiss ADCRR Defendants Oros, Lee, Abbott, and Twyford with prejudice. (Doc. 125). On September 21, 2021, the Court granted the parties' Joint Stipulation to Dismiss ADCRR Defendants Currier and Papworth (Doc. 138).

Accordingly, the remaining parties to this case are Ryan, Pratt,[2] Coleman, Western, Hale, Lieberman, and Kay.

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying

---

[2] Defendant Pratt has not filed a motion for summary judgment or other dispositive motion.

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts**

    **A. Eighth Amendment Medical Claims**

On June 5, 2017, during her incarceration in the Arizona State Prison Complex-Perryville ("ASPC-Perryville"), Plaintiff was sent to an offsite doctor for "medical eye injections," during which the doctor used iodine on Plaintiff's face and eyes, causing Plaintiff to suffer an allergic reaction. (Doc. 140 (Pl.'s Statement of Facts) at 7, ¶ 1.)[3] After

---

[3] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

- 3 -

returning to ASPC-Perryville, Plaintiff was checked by a nurse. Plaintiff informed the nurse she was experiencing pain, and the nurse gave her Tylenol. (*Id.* at 7, ¶ 2.) When Plaintiff returned to her cell, her cellmate told her she had "brownish-yellow stuff" on her face; Plaintiff and her cellmate tried to address Plaintiff's worsening reaction by placing a wet washcloth on Plaintiff's eyes. (*Id.* at 7, ¶ 4.) Plaintiff claims that as the reaction started to escalate, her eyes began to itch and swell, and her eyelids became "extremely swollen." (*Id.* at 7, ¶ 5.)

Plaintiff's cellmate wrote a Health Needs Request (HNR) for Plaintiff and, around 2:00 p.m., the two went to the medical unit to seek care for Plaintiff. (*Id.* at 8, ¶ 6.) The nurse told Plaintiff that they were not accepting any more HNRs that day and said she saw nothing to be concerned about, but if Plaintiff's symptoms continued or worsened, Plaintiff should request an Incident Command System ("ICS"). (*Id.* at 8, ¶ 7.) According to Plaintiff, any employee can activate an ICS. For a medical ICS, prison staff would call "main control, tell them they are starting an ICS, and call for responders." (*Id.* at 8, ¶ 9.) A few hours after seeing the nurse, Plaintiff's symptoms were worsening. Her roommate summoned Defendant Western, a correctional officer, who went to Plaintiff's cell and noticed Plaintiff's face was "slightly flushed." (*Id.* at 8, ¶ 12.) Defendant Western had the authority to activate an ICS, but did not. Defendant Western contacted her supervisor, Defendant Coleman. Before checking on Plaintiff, Defendant Coleman consulted with "medical" and was told there was no emergency and he did not need to call an ICS. (*Id.* at 9, ¶ 16.) Coleman conveyed this information to Western. (*Id.*) In his deposition, Defendant Coleman stated the nurse told him that if he saw redness or swelling around Plaintiff's eyes, to "go ahead and call the ICS and send her up." (*Id.* at 9, ¶ 21; Doc. 140-4 at 9:4-6.)

Defendant Coleman went to Plaintiff's cell where Plaintiff told him that she believed she was having an allergic reaction and that the nurse had told her earlier to request and ICS if her symptoms persisted. (*Id.* at 9, ¶ 20.) Defendant Coleman asked her if she was breathing, she said, "yes," and he told her she could see medical in the morning. (*Id.*)

Defendant Coleman claims that when he went to Plaintiff's room, he told her "medical says it's not an emergency . . . so let me see your face." (Doc. 140-4 at 9:19-22.) Plaintiff then took the cloth off her face, and Coleman told her he did not see any redness or swelling. (*Id.*) Plaintiff disputes these facts and contends Coleman did not look at her face because it was covered with a cloth. (Doc. 140 at 10, ¶ 22.)

Around 6:30 p.m., Plaintiff's cellmate and a few other prisoners asked Western to issue an ICS because Plaintiff was having an allergic reaction. (*Id.* at 10, ¶ 23.) Western returned to Plaintiff's cell, and Plaintiff told her "my face feels like it's on fire . . . my eyes are burning." (*Id.* at 10, ¶ 24.) Western told her that Defendant Coleman had denied an ICS. (*Id.*) Defendant Western stated that she noticed Plaintiff's face was "slightly flushed," but "did not perceive a slightly flushed face to be an emergency . . . especially in light of the fact that it was June and 'hot that day, extremely hot.'" (Doc. 132 (Defs.' Statement of Facts) at 4, ¶ 35.)

Plaintiff contends no prison staff checked on her during the night. (Doc. 140 at 10, ¶ 27.) Plaintiff returned to the medical department the next morning and was seen by a nurse who noted Plaintiff's face was "red and swollen" and that Plaintiff was "in pain." (*Id.* at 10, ¶ 29.) Plaintiff received steroid injections. (*Id.* at 11, ¶ 30.) Plaintiff asserts that as a result of the allergic reaction, she has "continuous facial redness and experiences a burning sensation . . . [and] when she has [a] flare-up, . . . it feels like her face is being stretched." (*Id.* at 11, ¶ 31.)

**B.     Retaliation and Mail Claims**

On July 21, 2017, Plaintiff testified in *Parsons*, a class action prisoner civil rights lawsuit against ADCRR, regarding the HNR process and her experiences on June 5, 2017. (*Id.* at 12, ¶ 37.) When Plaintiff left the prison to testify, her property was "'rolled up'—packed and locked away." (*Id.* at 12, ¶ 38.) This caused Plaintiff to feel "uncertain about what would happen and fearful of retaliation." (*Id.*) Five days after Plaintiff returned to the prison from testifying in *Parsons*, Defendant Kay ordered Plaintiff's cellmate moved to another cell. (*Id.* at 12, ¶ 39.) Plaintiff's new cellmate was a pregnant woman, "which

meant she slept in the air-conditioned yard office at night." (*Id.*) Plaintiff asserts this "left [Plaintiff] alone in the room if [she] wasn't working, which was alarming because anybody could come in, do anything." (*Id.*) On July 25, 2017, Magistrate Judge Duncan ordered Plaintiff reassigned to a cell with her former cellmate. (*Id.* at 13, ¶ 41.) In the Order, Judge Duncan stated, "cell transfers, loss of property, and spreading potentially damaging information to other inmates are all adverse actions." (Doc. 140-13 at 3.) Judge Duncan further stated, "the temporal proximity between [the inmates'] protected conduct and the adverse actions are too close in time to reasonably be viewed as anything other than retaliatory" and "none of the justifications Defendants presented to the Court established a legitimate penological interest." (*Id.*)

After the Order was issued, Defendant Ryan sent an email to the "Executive Team and Wardens at the ADOC" that stated in part, "Magistrate Judge Duncan . . . accepted as unalterable truth the bare allegations of two inmates" and "you all deserve much better than this preconceived ORDER and the jaundiced media reporting of it." (Doc. 140 at 13, ¶ 42; Doc. 140-14.)

According to Plaintiff, on "one occasion, while delivering [Plaintiff] her legal mail, Defendant Lieberman opened the envelope, dumped out the papers and said[,] 'oh, is this the paperwork that's going to take the prison down?'" (*Id.* at 13, ¶ 43.) Lieberman "made this remark about her private legal issues in an open bay where everyone could hear." (*Id.*) In his deposition, when questioned whether he had ever asked Plaintiff if the documents in her legal mail were "going to take the ADOC down?," Lieberman replied, "No. I think I smiled. I said—I smiled like this, and said, oh, so that's going to end us all, and then you have to sign for it, and that was the end of it." (Doc. 140-15 at 2:11-18.) Before Lieberman made the remark, he knew there was a pending lawsuit, Plaintiff had testified in that lawsuit, and staff were not to "have a lot of interaction with her or don't talk to her a whole lot about it." (Doc. 140 at 14, ¶¶ 44-45, Doc. 140-15 at 3:13-21.) Defendant Lieberman also said to Plaintiff, "oh, you're the Martin Luther King of the prison," and, when other inmates stole her laundry, told her, "maybe it is revenge for the lawsuit." (Doc. 140 at 14,

¶ 47.) These comments scared Plaintiff because they were threatening and "could have subjected her to harassment from other inmates." (*Id.* at 14, ¶ 48.)

Plaintiff was transferred to the Santa Rosa Unit and began working at St. Mary's Food Bank, after which Defendant Hale began retaliating against Plaintiff by calling her a "crackhead" and a "whore." (*Id.* at 15, ¶ 52.) In his deposition, Defendant Hale admitted to calling prisoners "crackheads" but denies directing this at Plaintiff. (Doc. 140-16 at 3:9-16.) Defendant Hale also acknowledges he was disciplined for such action. (*Id.* at 6.) Plaintiff asserts Hale knew she was suing the prison because he conveyed this information to an employee of St. Mary's Food Bank and to other prisoners. (Doc. 140 at 15-16, ¶¶ 54, 55.) Because of Defendant Hale's comments, Plaintiff feared retaliation from other inmates. (*Id.* at 16, ¶ 56.)

After being disciplined, Defendant Hale was transferred to the prison mailroom, where he sorted mail. (*Id.* at 16, ¶ 58.) Plaintiff "believes Officer Hale is also responsible for redacting addresses on [Plaintiff's] mail to an attorney." (*Id.* at 16, ¶ 59.) Plaintiff believes this because Defendant Hale was working in the mailroom "at the time the addresses were whited out on her legal mail, and no other employee in the mailroom during this time had any reason to be angry at [Plaintiff]." (*Id.* at 16, ¶ 60.)

**IV. Discussion**

  **A. Eighth Amendment Medical Claims**

To prevail on a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

### 1. Coleman and Western

Defendants argue Coleman and Western are entitled to summary judgment because they are not medical personnel and, as correctional officers, "their sole duty regarding Plaintiff was to determine whether an actual emergency existed regarding Plaintiff's allergic reaction." (Doc. 131 at 16.) Defendants contend Plaintiff had been repeatedly seen by medical staff after returning from her offsite appointment, had been given permission to visit the medical unit as recently as the afternoon of the day in question, and had been told by nurses at 8:45 a.m. and 2:00 p.m. that "there did not appear to be anything alarming going on with her face, even though Plaintiff told those nurses she was having an allergic reaction." (*Id.*) Defendants contend Western and Coleman "did not perceive a

medical emergency to exist, nurses had repeatedly told Plaintiff that there was no emergency, and medical staff were available to Plaintiff the very next morning." (*Id.*)

Plaintiff asserts her reaction to the iodine continued to significantly worsen and become more painful over the course of the day. Plaintiff claims "several other inmates attempted to get help from Defendants Coleman and Western, but the defendants ignored their requests . . . [and] did not do anything to address or alleviate Ms. Ashworth's medical issue." (Doc. 139 at 10.) Plaintiff claims her face "'felt like it was on fire' all night and her eyelids 'were so swollen' that she could actually see them.'" (*Id.*) Plaintiff also claims she spent the night taking allergy tablets and putting cold washcloths on her face. (*Id.*) By the next morning, Plaintiff's allergic reaction required treatment with steroids. Plaintiff argues her condition was serious because it "caused unnecessary and wanton infliction of pain" and asserts "it is undisputed that Defendants Coleman and Western did not do anything to address these concerns, even though a nurse told them to issue an ICS if her condition persisted or worsened." (*Id.* at 10-11.) In addition to Plaintiff's account of her allergic reaction, Plaintiff also submitted statements from five other prisoners who observed her eyes to be red and swollen, a rash on her face and neck, and Plaintiff in distress and/or pain. (Docs. 140-7, 140-8, 140-9, 140-10, and 140-11.)

The parties' arguments and factual assertions demonstrate a genuine issue of material fact regarding both the severity of Plaintiff's reaction to iodine during the evening of June 5, 2017, and whether the severity of her injury was readily apparent such that Defendants Western or Coleman knew or should have known she was in pain. Although Defendants Western and Coleman state they did not perceive an emergency, Plaintiff's description of her symptoms, and the statements of other prisoners who saw Plaintiff during that time, indicate Plaintiff was visibly suffering a severe allergic reaction and was in pain. A reasonable jury could conclude that Defendants Western and Coleman were in a position to avert the harm to Plaintiff but failed do so with deliberate indifference. Accordingly, there are disputed issues of material fact that preclude summary judgment in favor of

Defendants Western and Coleman.  The Court will therefore deny summary judgment on the Eighth Amendment medical claims against Defendants Western and Coleman.

### 2. Ryan

Defendants contend that Defendant Ryan played no actual role in Plaintiff's medical treatment. (Doc. 131 at 3.)  In his Declaration, Defendant Ryan states he "had no personal participation in the handling of Ms. Ashworth's June 5-6 2017 allergic reaction and medical treatment" and "had no knowledge of this event at the time that it occurred, until it was brought to [his] attention well after the fact." (Doc. 132-2 at 43.)  Defendants assert that although Plaintiff claims in her First Amended Complaint that Defendant Ryan failed to implement an HNR system that "ensured Plaintiff would receive medical attention within a reasonable time," there is "no factual context in the FAC to explain how this supports a Section 1983 claim." (Doc. 131 at 3.)

Plaintiff does not dispute these assertions in her Response, and the record contains no evidence showing Defendant Ryan was actually aware of Plaintiff's medical conditions in general, or her need for medical treatment on June 5, 2017.  Accordingly, the Court finds there is no genuine issue of material fact with respect to Defendant Ryan and Plaintiff's medical treatment.  The Court will grant summary judgment as to Plaintiff's Eighth Amendment medical claims against Defendant Ryan.

### B. Retaliation

#### 1. Order in *Parsons*

As an initial matter, the Court finds that Judge Duncan's July 25, 2017 Order in *Parsons,* Doc. 2209 in CV 12-00601-PHX-ROS, does not preclude consideration of the retaliation claims in this case.  "Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties." *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

> To foreclose relitigation of an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in

>the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

*Id.*

Judge Duncan's Order did not address the liability of individual correctional officers and therefore did not present an issue identical to the retaliation issues in this case. Moreover, the question of retaliation was not fully litigated, and Judge Duncan's determination was not a necessary part of any judgment in *Parsons*. Accordingly, Judge Duncan's Order is not preclusive.

### 2. Eighth Amendment

To the extent Plaintiff claims she suffered retaliatory acts in violation of the Eighth Amendment, Plaintiff does not assert facts to support such a claim. To prevail on an Eighth Amendment claim, plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added). None of the retaliatory acts alleged by Plaintiff—verbal harassment, rolling up of property, cellmate assignment, or mail tampering—resulted in a substantial risk of serious harm to Plaintiff's health or safety. Accordingly, Plaintiff's Eighth Amendment claims fail as a matter of law.

### 3. Conspiracy

In her First Amended Complaint, Plaintiff alleges Defendants "conspired" to retaliate against her for her testimony in the *Parsons* case. To prevail on a conspiracy claim, a plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional rights.'" *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (citation

omitted). The Court "need not, however, accept as true allegations that . . . are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001); *see also Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989) (conclusory allegations of conspiracy did not support a § 1983 claim); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A mere allegation of conspiracy without factual specificity is insufficient.").

Plaintiff has not offered any facts demonstrating an agreement or meeting of the minds between Defendants. Nor is there a "conspiracy" simply because Defendants engaged in the same conduct. *See Myers v. City of Hermosa Beach*, 299 F. App'x 744, 747 (9th Cir. 2008) ("Before a conspiracy claim can be sustained, a plaintiff must show a meeting of the minds by the so-called conspirators. . . . [T]he evidence adduced must demonstrate more than the mere fact that two people did or said the same thing; the evidence must actually point to an agreement.") (citations omitted); *cf. Ting v. United States*, 927 F.2d 1504, 1512-13 (9th Cir. 1991) (finding insufficient evidence that defendants "conspired" to distort the facts surrounding a shooting, although the agents had a post-shooting meeting to discuss the plaintiff's arrest, failed to explain an injury to the plaintiff's arm, and allegedly made false statements regarding the circumstances of the shooting).

Absent facts demonstrating that the individual Defendants came to an agreement or meeting of the minds to retaliate against Plaintiff, Plaintiff's retaliation claim fails as a matter of law and the Court will dismiss this claim with prejudice.

### 4. First Amendment Retaliation

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of her First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408

F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that her exercise of her First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff alleges four specific retaliatory acts: "rolling up" of her property while she was testifying in *Parsons*; assignment of a new cellmate; verbal harassment; and tampering with her mail.

### a.     Property Roll-Up

Plaintiff alleges that, while she was away from the Perryville Complex for the purpose of testifying in the *Parsons* case, her property was "rolled up," or packed away and stored during her absence. Plaintiff does not allege or offer evidence that any of the remaining named Defendants were responsible for packing her property away or ordered her property packed away, nor does Plaintiff present any evidence that "rolling up" property while an inmate is away at court does not serve the legitimate penological purpose of protecting the inmate's property from theft or damage by other inmates.[4] Accordingly, Plaintiff has not demonstrated a genuine issue of material fact on this claim.

### b.     Reassignment of Cellmate

Plaintiff claims that five days after she testified in the *Parsons* case, Defendant Kay ordered Plaintiff's cellmate assigned to a new cell. Plaintiff's new cellmate was pregnant, meaning she slept in an air-conditioned office at night, and Plaintiff was alone in the cell. Plaintiff claims "anybody could come in, do anything." (Doc. 139 at 6.)

---

[4] In her testimony at the evidentiary hearing regarding retaliation in *Parsons*, Perryville Warden Kim Currier testified that Plaintiff returned from court on July 14, 2017, and her property was returned to her on the same day. (*See* Doc. 130-1 at 6.)

Although Plaintiff asserts her testimony was a motivating factor for the reassignment because it occurred five days after she returned from court, Defendants correctly assert that the record contains no evidence to support this conclusion. Defendant Ryan's email to ADC staff regarding Judge Duncan's Order, although critical in tone, contained explicit instructions that staff were not to engage in "real or perceived" retaliatory behavior against the inmates who had testified. (Doc. 140-14.) In his Declaration, Defendant Kay stated he assigned the pregnant inmate to Plaintiff's cell because his "judgment and experience as an officer was that Ms. Ashworth would be a reasonable person with whom this inmate could be housed, with whom there would be no security or safety concerns in terms of their compatibility" and that was "the only basis on which I decided to move [Plaintiff's former cellmate] to another location." (Doc. 132-2 at 3.) Defendants argue that Defendant Kay "moved [Plaintiff's cellmate] for ordinary and routine reasons," and contend Plaintiff has not disclosed any facts to dispute Kay's statements. (Doc. 131 at 14.)

Plaintiff's Response does not offer facts contradicting Defendant Kay's statements but relies on Judge Duncan's Order in support of her claims against Kay. (Doc. 139 at 6.) As noted above, Judge Duncan's Order did not consider liability of individual correctional officers and did not fully litigate the question of retaliation. Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact as to the claim that Defendant Kay reassigned her cellmate *because of* Plaintiff's protected conduct.

### c.     Verbal Harassment

Plaintiff claims Defendant Lieberman, on one occasion while delivering her legal mail, dumped out the contents of the envelope; said, "oh is this the paperwork that's going to take the prison down?"; and called her the "Martin Luther King of Prison." On another occasion, when Plaintiff reported her laundry had been stolen, he said, "maybe it is revenge for the lawsuit." Plaintiff construed the comments as threatening and believed they could have subjected her to harassment by other inmates.

Plaintiff asserts Defendant Hale called her a "crackhead" and a "whore" in front of volunteers at St. Mary's Food Bank, where Plaintiff was employed, and told other inmates Plaintiff was "sue happy." Plaintiff feared retaliation from other inmates because of his remarks.

Defendants correctly argue that Lieberman and Hale's statements do not, in themselves, support a claim for retaliation because verbal threats are insufficient to state a § 1983 claim. *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (defendants' threats of bodily harm to convince plaintiff not to pursue legal redress were insufficient to state a claim under § 1983); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) ("'[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983'" (quoting *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979))); *see also McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) ("mere threatening language and gestures . . . do not, even if true, amount to constitutional violations" (quoting *Coyle v. Hughes*, 436 F. Supp. 591, 593 (W.D. Okla. 1977))).

To the extent Plaintiff claims these Defendants' statements chilled her First Amendment rights or threatened her safety by placing her in danger from other inmates, Defendants correctly assert that the record contains no evidence to support this assertion. Defendants contend Lieberman's remarks were made in December 2017, several months after Plaintiff's testimony and argue there are no facts demonstrating that the remarks materially affected her testimony. (Doc. 131 at 7.) In her Response, Plaintiff argues only that Lieberman's comments were "threatening" and states Lieberman was disciplined for making them, but she does not argue or point any evidence showing his comments chilled her exercise of her First Amendment rights or show that she suffered more than minimal harm. (Doc. 139 at 7.)

With respect to Defendant Hale, Defendants argue that even if Defendant Hale's remarks constituted an adverse action, "there is no evidence of causation between those words and Plaintiff's testimony" and Plaintiff does not "even allege in her FAC that Hale's words somehow caused her to fear testifying in court." (Doc. 131 at 15.) Plaintiff does

not assert in her First Amended Complaint or in her Response that Hale's remarks chilled her exercise of her First Amendment rights. Although Plaintiff states she feared Hale's remarks would result in retaliation by other inmates, Plaintiff does not offer facts demonstrating retaliation or the threat of retaliation by other inmates. Plaintiff's Response states, "Defendant Hale . . . told other inmates who were working at St. Mary's that Ms. Ashworth was 'suing the prison,'" those inmates relayed Defendant Hale's comments to her, and "other inmates also told Ms. Ashworth that Defendant Hale told them Ms. Ashworth was 'sue happy.'" (Doc. 139 at 8.) These facts do not demonstrate the other inmates threatened her or did more than inform her of Hale's comments. Absent a showing that Hale's comments chilled her exercise of her First Amendment rights or caused her more than minimal harm, Plaintiff's retaliation claim based on Defendant Hale's comments fails as a matter of law.

### d.     Mail

Plaintiff also claims Defendant Hale was responsible for altering the address on her mail to an attorney because Hale was working in the mailroom at the time the addresses were whited out on her legal mail, and "no other employee in the mail room during this time had any reason to be angry at Ms. Ashworth." (Doc. 139 at 8.)

In his deposition, when asked if he admitted to altering an address on Plaintiff's legal mail, Defendant Hale responded "absolutely not." (Doc. 132-3 at 11.) Defendant Hale also stated that he did not have access to Plaintiff's legal mail because it was processed by her housing unit, not the area in which he worked. (*Id.*) Defendants argue Plaintiff has produced no evidence to contradict Defendant Hale's statements, no evidence to explain "how Hale could have logistically been the person responsible" for altering the mail, and no forensic or eyewitness evidence. (Doc. 131 at 7.) In her Response, Plaintiff simply repeats her belief that Defendant Hale altered her mail because he was the only employee in the mailroom who "had any reason to be angry at Ms. Ashworth." This is insufficient to demonstrate a genuine issue of material fact. Accordingly, Plaintiff's retaliation claim based on Hale's alleged alteration of her mail fails as a matter of law.

### 5. Conclusion

Considering the facts in the light most favorable to Plaintiff, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

## C. Qualified Immunity

Defendants assert they are entitled to qualified immunity, but do not brief the issue and state they "reserve the right to fully develop their arguments on qualified immunity . . . whether through leave for a second dispositive motion or at trial." Accordingly, the Court will not rule on the issue of qualified immunity.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 131).

(2) Defendants' Motion for Summary Judgment (Doc. 131) is **granted in part and denied in part.**

    (a) The Motion is **granted** with respect to Plaintiff's First and Eighth Amendment retaliation claims, and Plaintiff's Eighth Amendment medical claims against Defendant Ryan. These claims are **dismissed with prejudice**.

    (b) The Motion is **denied** with respect to Plaintiff's Eighth Amendment medical claims against Defendants Western and Coleman.

(3) Following the Court's resolution of the Motion for Summary Judgment, the remaining Defendants are Pratt, Western, and Coleman.

(4) This action is referred to Magistrate Judge Eileen S. Willett to conduct a settlement conference on the remaining claims.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

(5) Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Willett's chambers at (602) 322-7620 within 14 days to schedule a date for the settlement conference.

Dated this 3rd day of March, 2022.

Honorable Steven P. Logan
United States District Judge